J-S10036-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ERIC NICHOLSON | : | |
| | : | |
| Appellant | : | No. 784 WDA 2023 |

Appeal from the Judgment of Sentence Entered June 7, 2023
In the Court of Common Pleas of Fayette County Criminal Division at
No(s):  CP-26-CR-0000933-2022

BEFORE:  OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: June 14, 2024**

Eric Nicholson ("Nicholson") appeals from the judgment of sentence imposed following his convictions for possession of a controlled substance by an inmate, possession with intent to deliver, and related drug charges.[1]  We vacate the judgment of sentence, vacate the convictions, and remand for a new trial.

The relevant factual and procedural history is as follows.  In 2021, Nicholson was incarcerated at the State Correctional Institution ("SCI") in Fayette when drugs were found in his prison cell by Corrections Officers ("CO") Kevin Doran and Charles Scoles, who conducted an investigative search of Nicholson's prison cell at the instruction of their supervisor, Security Lieutenant Wood.[2]  **See** N.T., 6/5/23, at 49.  CO Doran confirmed that

---

[1] **See** 18 Pa.C.S.A. § 5123(a.2); 35 P.S. §§ 780-113(a)(30), (16), (32).

[2] Lieutenant Wood's first name is not indicated in the certified record.

Lieutenant Wood had "the intel," and told CO Doran to search Nicholson's cell. *Id*. During the search, CO Doran asked Nicholson if he had contraband and Nicholson replied, "yes, I actually do have . . . [a] new strand" of drugs. *Id*. at 37. Nicholson then retrieved the drugs from his cell locker and surrendered them to CO Doran. *Id*. The exterior packaging for a portion of the drugs had been marked with a "five." *Id*. However, CO Doran recalled that Nicholson wanted to keep some of the drugs so that he could give them to Lieutenant Wood. *Id*. at 38; *see also id*. at 52-53. CO Doran denied Nicholson's request and confiscated all of the drugs. *Id*. According to CO Doran, the drugs taken from Nicholson consisted of ten point three grams of flake synthetic cannabinoids. *Id*. at 39-40. The drugs had been separated into five individual baggies and ten individually wrapped cigarette joints, which suggested to CO Doran that they were not intended for personal consumption. *Id*. at 40. CO Doran explained that the drugs in Nicholson's cell were not a "new strand" because they already had that strain in the prison. *Id*. at 55. CO Doran further explained that Nicholson was not permitted to have any contraband in his cell. *Id*. at 57.

Agent Alexandria Constantine of the Department of Corrections' Bureau of Investigations and Intelligence retrieved the drugs from SCI Fayette, transported them to the Pennsylvania State Police Crime Lab for testing, and conducted an investigation. *Id*. at 67-75. Agent Constantine attempted to

interview Nicholson; however, after reading him his **_Miranda_**[3] rights, Nicholson declined to speak to her other than to state that "he had some of the strand to hand over to Lieutenant Wood." **_Id_**. at 76.

The above-referenced drug charges were then filed against Nicholson and the matter eventually proceeded to a jury trial in June 2023. At the time of trial, Nicholson was housed at SCI Mahanoy. Prison officials transported him to SCI Fayette one week before trial. Three days before trial, he was transported from SCI Fayette to Fayette County Prison. When leaving SCI Fayette, the prison staff seized Nicholson's belongings, including legal paperwork consisting of three notebooks, a folder, and a legal envelope. On the morning of trial, defense counsel informed the trial court that the paperwork Nicholson compiled regarding his defense was being held at SCI Fayette. Several phone calls were made to SCI Fayette, but prison officials claimed that only toiletries were taken from Nicholson. Nicholson insisted that his legal paperwork had been taken and his counsel moved for a mistrial, which motion was denied. Meanwhile, the jury was impaneled. Agent Constantine, who was present in the courtroom, made further phone calls to officials at SCI Fayette, eventually learning that there was a box of Nicholson's belongings, including paperwork, still at the prison. Both sides presented their opening statements. The jury took a recess for lunch, at which point Agent Constantine drove from the courthouse to SCI Fayette to retrieve the box from

_____

[3] **_Miranda v. Arizona_**, 384 U.S. 436 (1966).

the prison. When Agent Constantine returned to the courthouse, she gave Nicholson his paperwork; however, he claimed that there were pages ripped out of the notebooks, and affidavits from other prison inmates working with Lieutenant Wood were missing. Defense counsel renewed his motion for a mistrial, and it was again denied.

The Commonwealth then presented the testimony of CO Doran and Agent Constantine, as detailed above, as well as the testimony of CO Scoles. Nicholson testified that at the time his cell was searched, he had been working for Lieutenant Wood to provide him with information on how and where inmates would hide things. *See* N.T., 6/5/23, at 81. Nicholson explained that most of Lieutenant Wood's requests concerned intelligence, such as "what was going on, how it was going on, when it was going on, and who it was going on with." *Id*. at 82. In return for this information, Lieutenant Wood gave Nicholson ten electronic cigarettes at the beginning of each month and promised him help secure parole and institutional benefits. *Id*. According to Nicholson, Lieutenant Wood had asked him to obtain some of the new strand of drugs that were circulating in the prison, and not merely to tell him who had the drugs. *Id*. at 82, 92. Nicholson stated that Lieutenant Wood wanted him to "[r]etrieve the new strand, he wanted it in his hands." *Id*. at 92. Nicholson testified that this request was the second time that Lieutenant Wood asked him to secure drugs." *Id*. at 82.

Nicholson indicated that before his cell was searched, he "sent a request slip to Lieutenant Wood, [stating] I have the new strand and either call me to

your office so that I bring it [*sic*] to you or come and get it." ***Id***. Nicholson testified that he marked the drugs and his correspondence to Lieutenant Wood with the number "five," as that was his code number or code name because he could not use his name. ***Id***. at 83. Nicholson claimed that his interactions with Lieutenant Wood were kept confidential between the two of them because Lieutenant Wood did not want other prison officers involved, since it was prison officers who were bringing the drugs into the prison. ***Id***. at 82-83. Nicholson testified that he had, in fact, bought the drugs which were found in his cell from a prison officer. ***Id***. at 83. Nicholson stated that he had not used or sold any of the drugs that he had purchased for Lieutenant Wood. ***Id***. Nicholson additionally stated that he did not ask to retain any of the drugs and, instead, told CO Doran to give all of the drugs to Lieutenant Wood. ***Id***. Nicholson indicated that CO Doran responded, "who do you think sent me." ***Id***. at 84. Nicholson further explained that, although his notebooks and folder had been returned to him, several pages had been ripped out of them, including affidavits from other inmates who had previously worked with Lieutenant Wood. ***Id***. at 88.

CO Doran testified on rebuttal that in the prison, there are some inmates who are confidential human sources ("CHS"). ***Id***. at 94. He explained that the inmates who serve as CHS are registered on file with the security captain and are given a number to go with their name which is kept on file. ***Id***. at 94-95. According to CO Doran, the assigned number for the CHS is used "on paper[]work and everything." ***Id***. at 95. CO Doran testified that CHS are not

permitted to be in possession of contraband, and if caught with contraband, they would be charged just like any other individual in the prison. *Id*. at 95-96. Further, CO Doran testified that, to his knowledge, Nicholson was not a CHS at SCI Fayette. *Id*. at 96. However, he conceded that he had no responsibilities to recruit, hire, or supervise CHS, and that if Nicholson was a CHS, then it was possible that CO Doran was unaware of his status as such. *Id*. at 96-98.

Prior to closing statements, defense counsel raised the defense of entrapment and requested that the trial court instruct the jury on entrapment and entrapment by estoppel based on Nicholson's testimony that he obtained the drugs at the direction of Lieutenant Wood. The trial court denied Nicholson's request to charge the jury on entrapment and entrapment by estoppel. At the conclusion of trial, the jury found Nicholson guilty of the above-referenced charges. On June 7, 2023, the trial court sentenced Nicholson to three to six years of incarceration. Nicholson filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Nicholson raises the following issues for our review:

1. Whether the trial court erred in denying [Nicholson's] requested jury instruction[s] on the defense of entrapment?

2. Whether the trial court abuse[d] its discretion in denying . . . Nicholson's request for a continuance and/or a mistrial based on the improper confiscation of [his] legal papers by the correctional officers at SCI[]Fayette?

Nicholson's Brief at 5.

In his first issue, Nicholson challenges the trial court's decision to deny his request for jury instructions on entrapment. Our standard of review is as follows:

In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to the a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal.

***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted); ***see also Commonwealth v. Borgella***, 611 A.2d 699, 700 (Pa. 1992) (holding that "[a] defendant is entitled to an instruction on any recognized defense which has been requested, which has been made an issue in the case, and for which there exists evidence sufficient for a reasonable jury to find in his or her favor") (quotations and citations omitted).

The defense of entrapment, as defined in the Commonwealth of Pennsylvania, is based upon an objective standard intended to deter overreaching on the part of law enforcement and those individuals acting in cooperation with law enforcement, such as confidential informants. ***See***

***Commonwealth v. Willis***, 990 A.2d 773, 775 (Pa. Super. 2010). The Crimes

Code defines the defense of entrapment as follows:

>  (a)  General rule.—A public law enforcement official or a person acting in cooperation with such an official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages another person to engage in conduct constituting such offense by either:
>
>  (1)  making knowingly false representations to induce the belief that such conduct is not prohibited; or
>
>  (2)  employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it.

18 Pa.C.S.A. § 313(a). "[A] person prosecuted for an offense shall be

acquitted if he proves by a preponderance of evidence that his conduct

occurred in response to an entrapment." ***Id***. § 313(b).

Importantly, the entrapment statute conditions the availability of the

defense only on a defendant's ability to establish its elements by a

preponderance of the evidence. ***See id***. Such elements have been

characterized as "operative facts," which consist of "those [facts] that are

necessary for appellant to prove by a preponderance of the evidence that he

was entrapped." ***Commonwealth v. Marion***, 981 A.2d 230, 239 (Pa. Super.

2009). "Under the objective test for entrapment, these would be facts that

go to the course of conduct of a government officer or agent that would fall

below standards to which common feelings respond, for the proper use of

government power." ***Id***. "The question of whether entrapment has occurred

is a question for the jury, unless the evidence points to only one conclusion, in which case it may be decided as a matter of law." ***Commonwealth v. Harris***, 636 A.2d 210, 227-28 (Pa. Super. 1994) (citation omitted). However, where the operative facts supporting the defense of entrapment are disputed, the defense is properly submitted to the jury. ***See Commonwealth v. Mance***, 619 A.2d 1378, 1381 (Pa. Super. 1993) (holding that where there is conflicting testimony on the subject of entrapment, the conflict is for the jury to resolve). Although it may be difficult for a fact-finder to believe that a person who has denied any criminal wrongdoing was entrapped into doing a criminal act, the law of this Commonwealth does not bar a jury instruction on entrapment on the basis of a jury's potential incredulity. ***See Borgella***, 611 A.2d at 700.

Nicholson argues that the trial court erred by refusing to instruct the jury of the defense of entrapment. Nicholson points to his trial testimony wherein he stated that Lieutenant Wood, a Security Lieutenant at SCI Fayette, recruited him to gather intelligence about drugs entering the prison and being secreted by inmates and/or correctional officers and, in return, provided him with e-cigarettes and promised to provide assistance to Nicholson when he sought parole. Nicholson additionally points to his trial testimony that Lieutenant Wood asked him to purchase and/or obtain a new strand of drugs that had been entering the prison and Nicholson complied with that directive and informed the lieutenant through a request slip that he had obtained the

illegal contraband. Nicholson asserts that his trial testimony, standing alone, was sufficient to establish his entitlement to an instruction on the entrapment defense such that the issue should have been submitted to the jury. Nicholson maintains that the trial court erred by initially concluding that he was not entitled to an instruction on the entrapment defense because he failed to show that it was legal for an inmate to possess a controlled substance, and by later concluding that he was not entitled to the instruction because his entrapment accusations were not corroborated and CO Doran disputed that Nicholson was a CHS. Nicholson contends that he was not required to establish that he was authorized to possess the drugs, and further points out that CO Doran merely indicated that he was unaware of whether Nicholson was a CHS.

The trial court considered Nicholson's first issue and determined that it lacked merit. The trial court reasoned:

> In this case, [Nicholson] has made statements that he obtained the strand of drugs for [the] Lieutenant. However, the record is devoid of any evidence in support of his statements. Agent Constantine investigated the allegation that [Nicholson] got the drugs for the Lieutenant but no evidence was elicited from her that this was the case[,] and the case has proceeded despite this investigation. The court determined that the uncorroborated statements of [Nicholson] were contradicted by the statements of [CO] Doran. The court determined that [Nicholson] did not meet his burden to prove the defense by a preponderance of the evidence and appropriately denied the instruction.

Trial Court Opinion, 9/30/23, at 6.

Based on our review, we conclude that the evidence was sufficient to entitle Nicholson to a jury instruction on entrapment. Nicholson's testimony

regarding the alleged actions of Lieutenant Wood detailed a course of conduct which fell below standards for the proper use of government power. ***See Marion***, 981 A.2d at 239. Nicholson provided sufficient operative facts to raise an entrapment defense by testifying that he had a confidential relationship with Lieutenant Wood whereby the lieutenant instructed Nicholson to gather intelligence and purchase illegal contraband in exchange for e-cigarettes and other benefits. ***See id***. The absence of corroborating testimony or evidence on the question of entrapment was not dispositive. Indeed, no corroborating testimony or evidence was required. ***See*** 18 Pa.C.S.A. § 313(b). Moreover, to the extent that the operative facts established by Nicholson were disputed to some extent by CO Doran's testimony that he was unaware of whether Nicholson was a CHS and that no CHS may possess illegal contraband, such dispute ***required*** the trial court to submit the defense to the jury. ***See Mance***, 619 A.2d at 1381.

Furthermore, after Nicholson established disputed operative facts of an entrapment, it was for ***the jury*** to decide whether Nicholson proved by a preponderance of the evidence that he was entrapped, not the trial court. ***See*** 18 Pa.C.S.A. § 313(b). Indeed, where the defendant presents evidence of entrapment, an entrapment instruction should be given no matter how unreasonable the court may believe the defendant's claims to be. ***See Harris***, 636 A.2d at 213 (holding that when deciding whether to instruct on entrapment, the trial court ***must*** consider the possibility that the jury would credit the testimony of the defendant). Accordingly, given that entrapment

- 11 -

was the central theory of Nicholson's defense, we conclude that the trial court's refusal to instruct the jury on entrapment was an error of law which controlled the outcome of the case as well as a fundamental error which prejudiced Nicholson. Consequently, we vacate the judgment of sentence, vacate the convictions, and remand for a new trial.

Given our disposition of Nicholson's first issue, we need not address his second issue.

Judgment of sentence vacated, convictions vacated, case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 06/14/2024